955 P.2d 377 (1998)
135 Wash.2d 141
ISLAND COUNTY, a political subdivision of the State of Washington, Respondent,
v.
STATE of Washington and the Community Council of Camano Island, Appellants.
No. 64947-2.
Supreme Court of Washington, En Banc.
Argued October 21, 1997.
Decided May 14, 1998.
*378 Christine Gregoire, Attorney General, William Collins, Assistant Attorney General, Olympia, Michael Majors, Deputy Attorney General, Everett, for Appellants.
William H. Hawkins, Island County Prosecutor, David L. Jamieson, Jr., Deputy County Prosecutor, Coupeville, for Respondent.
GUY, Justice.
This case involves a challenge to the constitutionality of RCW 36.105, the community council act, which allows the creation of "community councils" in counties made up entirely of islands with an unincorporated population of over 30,000 people. The superior court declared the statute to be unconstitutional. We affirm.

FACTS
The parties entered the following agreed facts but did not stipulate to the relevancy of those facts. In the 1991 legislative session, House Bill 1009 was introduced which would have authorized the formation of community councils. Those councils would have had the power to propose comprehensive planning and zoning within each of the counties of the State. That bill passed the House but did not pass the Senate.
*379 House Bill 1201 was also introduced in the 1991 legislative session and pertained to the elimination of the use of formal county classes and the substitution of population figures to distinguish counties. That bill originally contained no provision for the creation of community councils. After the Senate proposed several amendments to that bill, the House requested a conference with the Senate. The House and Senate conferees agreed on the proposed amendments and also added sections 99-108, which authorized the creation of community councils but only in counties consisting entirely of islands with a population exceeding 30,000, which includes only Island County.
Substitute House Bill 1201 was passed by both houses, and sections 99-108 of the bill were codified as RCW 36.105. The act sets forth the process for creating community councils. A community, for which a community council is created, can include "only unincorporated territory located in a single county with a population of over thirty thousand that is made up entirely of islands and not included within a city or town." RCW 36.105.030. The process to create a council is initiated by a voter filing a petition which sets the boundaries for the community. RCW 36.105.040(1). The act provides that a proposed community must have at least 1,000 residents or, when the community is an entire island, 300 residents. RCW 36.105.030.
The community of Camano Island is an unincorporated territory located entirely within Island County. In July 1994, a petition was filed with the Island County Auditor's Office asking Island County to schedule a public vote on the formation of a nine-member community council for Camano Island pursuant to RCW 36.105. The election procedures of that act were followed and a community council was elected on Camano Island. (A community council was also duly elected for the community of Greenbank, which is an unincorporated area on Whidbey Island. The Greenbank Community Council has waived its rights to be included in this case and has agreed to be bound by this decision.)
In September 1995, Plaintiff Island County brought suit against the State of Washington and the Community Council of Camano Island seeking a declaration that the community council act was unconstitutional. The parties entered an agreed statement of facts and made cross motions for summary judgment.
The superior court granted summary judgment to Island County, finding that the statute is "special legislation" which is prohibited by article II, § 28(6) and/or article XI, § 10 (amend.10) of the state constitution. Since the superior court invalidated the statute on the ground it was special legislation, the court did not rule on any of the other constitutional issues raised by Island County. The superior court held that the Community Council of Camano Island was invalid and void, as being established under an unconstitutional law.
The State and the Community Council of Camano Island appealed. We accepted direct review. The State and Camano Island Community Council ask us to reverse the trial court's order, grant summary judgment in favor of the defendants, and hold that the act does not violate the state or federal constitutions. The County asks us to affirm the superior court's grant of summary judgment or find the statute unconstitutional on other grounds.

ISSUES
Appellants State of Washington and Camano Island Community Council assign error to the superior court's order granting Island County's motion for summary judgment. The County argues that the statute violates a number of provisions of the state constitution and the Fourteenth Amendment of the federal constitution. Specifically, the County raises issues whether the statute:
(1) constitutes a special law granting corporate powers or privileges or creating a corporation for municipal purposes, contrary to article II, § 28(6) and/or article XI, § 10 of the state constitution;
(2) grants privileges to a class of citizens which do not apply equally to all similarly situated citizens, contrary to article I, § 12 of the state constitution;
*380 (3) revises other pre-existing statutory provisions without setting forth the text of the provisions, in violation of article II, § 37 of the state constitution;
(4) violates article XI, § 4 of the state constitution, which requires the Legislature to establish a uniform system of county government throughout the state; and
(5) violates the one-person, one-vote requirement of the equal protection clause of the Fourteenth Amendment of the United States Constitution.
The County has withdrawn its claim that the act violates article II, § 19 of the state constitution.
Since we hold that the act is invalid because it is special legislation, it is unnecessary to address the other constitutional challenges to the statute.

ANALYSIS
This matter is before the Court on appeal from summary judgment, so review is de novo. Washington Fed'n of State Employees v. State, 127 Wash.2d 544, 551, 901 P.2d 1028 (1995). Our traditional articulation of the standard of review in a case where the constitutionality of a statute is challenged is that a statute is presumed to be constitutional and the burden is on the party challenging the statute to prove its unconstitutionality beyond a reasonable doubt. E.g., State v. Myles, 127 Wash.2d 807, 812, 903 P.2d 979 (1995); Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 528, 520 P.2d 162 (1974). While we adhere to this standard, we take this opportunity to explain the rationale of such a standard. The "reasonable doubt" standard, when used in the context of a criminal proceeding as the standard necessary to convict an accused of a crime, is an evidentiary standard and refers to "`the necessity of reaching a subjective state of certitude of the facts in issue.'" State v. Smith, 111 Wash.2d 1, 17, 759 P.2d 372 (1988) (Utter, J., dissenting) (quoting In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)).
In contrast, the "beyond a reasonable doubt" standard used when a statute is challenged as unconstitutional refers to the fact that one challenging a statute must, by argument and research, convince the court that there is no reasonable doubt that the statute violates the constitution. The reason for this high standard is based on our respect for the legislative branch of government as a co-equal branch of government, which, like the court, is sworn to uphold the constitution. We assume the Legislature considered the constitutionality of its enactments and afford some deference to that judgment. Additionally, the Legislature speaks for the people and we are hesitant to strike a duly enacted statute unless fully convinced, after a searching legal analysis, that the statute violates the constitution. Smith, 111 Wash.2d at 17-18, 759 P.2d 372 (Utter, J., dissenting). See also Pacific Legal Found v. Brown, 29 Cal.3d 168, 624 P.2d 1215, 1221, 172 Cal.Rptr. 487, 493 (1981). Ultimately, however, the judiciary must make the decision, as a matter of law, whether a given statute is within the legislature's power to enact or whether it violates a constitutional mandate. E.g., Brown, 624 P.2d at 1221, 172 Cal.Rptr. at 493 (citing Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176-80, 2 L.Ed. 60 (1803)).
Even with this demanding standard of review in mind, we find that the County has borne its burden to convince us that the community council act violates our state constitution.
The Washington State Constitution prohibits the Legislature from enacting special or private laws in certain circumstances. Island County contends the community council act violates article II, § 28(6) and article XI, § 10 because it is "special legislation." Island County contends these provisions are violated because the statute applies only to counties composed entirely of islands with a population of over 30,000 people. RCW 36.105.010, .030. The parties agree that only Island County comes within this classification. The State and Camano Island contend the statute is a valid general law. Article II, § 28 provides:
The legislature is prohibited from enacting any private or special laws in the following cases:
*381 ....
6. For granting corporate powers or privileges.
It has long been recognized, and is not disputed by the parties, that this subdivision relates to powers conferred on municipal as well as private corporations. Terry v. King County, 43 Wash. 61, 86 P. 210 (1906); Miller v. City of Pasco, 50 Wash.2d 229, 235, 310 P.2d 863 (1957). The parties all agree that the community council act does grant corporate powers to community councils. The issue therefore is whether this is a "special law." Article XI, § 10 also prohibits the Legislature from creating corporations for municipal purposes by special laws.
McQuillin explains that "[t]he constitutional provisions forbidding special laws relating to municipal corporations were intended to prevent the legislature interfering with the government of municipal corporations, as well as to eliminate diversity of legislation upon a particular subject." 2 EUGENE McQUILLIN, LAW OF MUNICIPAL CORPORATIONS § 4.33 (3d rev. ed.1996) (footnotes omitted).
One noted authority has explained the concept of special legislation:
Provisions restrictive of special legislation have as their purpose preventing particular cities from being specially favored or specially discriminated against by the legislature. They may be regarded as the equivalent of the equal protection of the laws clauses which are applicable to individuals and private corporations.
The purpose of such provisions, to obtain uniformity and equality, is desirable. The difficulty is one of definition in ascertaining what is a special law and what a general law on a subject. The Washington court has stated:
The authorities are in substantial harmony upon the rule by which a law is to be tested to determine whether it is general or special. A special law is one which relates to particular persons or things, while a general law is one which applies to all persons or things of a class. A law is general when it operates upon all persons or things constituting a class, even though such class consists of but one person or thing; but the law must be so framed that all persons or things constituting the class come within its provisions.71
Though the authorities may be in "substantial harmony" upon the rule, they are not so upon its application. One thing is clear, however, and that is that a prohibition of special legislation does not mean classification is not permissible. By its very nature all legislation is necessarily based on a classification of some kind since no piece of legislation can relate to all things.
In determining whether a particular classification is valid, a test of reasonableness is imposed. This is dependent upon two basic considerations. First, do the different classes established by the legislature possess different characteristics? Secondly, do the different characteristics relate to the purpose and subject matter of the legislation?
....
The allowance of a classification if based upon substantially different characteristics and if reasonably related to the purpose of the legislative enactment is usually buttressed by the recognition of a broad discretion in the legislature to classify.
1 Young Men's Christian Ass'n of Seattle v. Parish, 89 Wash. 495, 497, 154 P. 785 (1916).
Philip A. Trautman, Legislative Control of Municipal Corporations in Washington, 38 WASH. L. REV. 743, 758-59 (1963) (citations omitted).
In City of Seattle v. State, 103 Wash.2d 663, 694 P.2d 641 (1985), this Court found that a statute which required a reasonable relationship between taxes to be paid and services to be received in an area to be annexed and which applied only to cities of over 400,000 in population was void as special legislation. We explained that
"A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. The test of a special law is the *382 appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes that makes it special, but what it excludes. If nothing be excluded that should be contained the law is general. Within this distinction between a special and a general law the question in every case is whether any appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects it is a general law."
(Italics ours.) YMCA v. Parish, 89 Wash. 495, 498, 154 P. 785 (1916). Thus, to survive a challenge as special legislation, any exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute.
City of Seattle, 103 Wash.2d at 674-75, 694 P.2d 641.
We concluded that while the purpose (to protect property owners from annexations which increase the annexing city's tax revenues but do not require comparable expenditures by the city for services) may be an admirable objective, we could not find any rational basis for limiting the application of that statute on the basis of the annexing city's population. The danger sought to be avoided was as applicable to small cities as to larger ones. See also Aetna Life Ins. Co., 83 Wash.2d at 537, 520 P.2d 162 (a law applicable to a class is a general law if the class is one requiring legislation peculiar to itself in the matter covered by the law); Equitable Shipyards, Inc. v. State, 93 Wash.2d 465, 479, 611 P.2d 396 (1980) (in determining if a law is unconstitutional because special, the focus is on what the law excludes); Pfeifer v. City of Bellingham, 112 Wash.2d 562, 570, 772 P.2d 1018 (1989) (to survive a challenge as special legislation, any exclusions from a statute's applicability must be rationally related to the purpose of the act).
In the present case, the superior court properly focused on whether the purpose of the legislation was rationally related to those counties which were excluded from its application. Excluded from the act's application are all the counties which are not composed entirely of islands with at least 30,000 people in unincorporated areas. In fact, this limitation excluded every county in the state with the exception of Island County. The superior court considered the fact that citizen participation may be difficult in island counties because of lack of transportation, and that there may be water supply issues that make development and planning unique for island communities. However, the court concluded that there was nothing unique about counties that are composed only of islands with populations over 30,000 people in unincorporated areas that does not apply to other counties that may have populated islands within their borders and which meet the population requirement. The court therefore concluded that there was no purpose of the legislation that was rationally related to excluding other counties with islands from its applicability.
This Court recently discussed a special legislation issue in CLEAN v. State, 130 Wash.2d 782, 928 P.2d 1054 (1996). One of the challenges in the CLEAN case was that the Stadium Act violated the state constitution because it was special legislation since it provided a means to construct a baseball stadium only in King County. Because only King County had a population exceeding one million, it was the only county presently within the ambit of the act. This Court explained:
Special legislation is legislation which operates upon a single person or entity. General legislation, on the other hand, operates upon all things or people within a class. A class, however, may consist of one person or corporation as long as the law applies to all members of the class.
We disagree that the Stadium Act is special legislation simply because it applies only to counties of a certain size. It is not uncommon for the Legislature to distinguish among cities on the basis of population and such legislation is upheld "[s]o long as population bears a rational relationship to the purpose and subject matter of the legislation." In order to "survive a challenge as special legislation, any exclusions from a statute's applicability, as well as the statute itself, must be rationally related to the purpose of the statute." *383 CLEAN, 130 Wash.2d at 802, 928 P.2d 1054 (citations omitted). The CLEAN majority then went on to demonstrate how the purpose of the Stadium Actto preserve the public's opportunity to view major league baseball and to maintain the economic benefits from a professional teambore a relation to limiting the construction to the most populous counties of the state. The legislative decision to exclude other counties from the ambit of the statute was rationally related to the purpose of the act.
In light of this authority, the relevant question here is whether the exclusion of all other counties from the community council act's applicability is rationally related to the purpose of the statute. We conclude that it is not. The purpose of the statute is to provide voters of island counties with a set population
with direct input on the planning and zoning of their community by establishing a governmental mechanism to adopt proposed community comprehensive plans and proposed community zoning ordinances that are consistent with an overall guide and framework adopted by the county legislative authority. In addition, it is the purpose of this chapter to have community councils serve as forums for the discussion of local issues.
RCW 36.105.010.
The State argues it is not unusual for the Legislature to use island geography and population as a basis for classification. This is true but does not answer the issue before us, which is whether the purpose of this particular statute is rationally related to the counties it excludes. The State argues that with regard to land use planning and zoning, islands will have to address unique situations. Such situations include the fact that (1) growth is constrained in all directions by marine shorelines, (2) accessibility of water resources is different from mainland water resources and may vary from island to island, and (3) transportation planning must take into account separation from the mainland and internal separation from other islands. The State argues that island geography is also related to the goal of the Growth Management Act to encourage the involvement of citizens in the planning process and the goal of the community council act to provide community members with input on planning in Island County. The State also argues that the population threshold requirement is rationally related to a county's financial ability to finance the work of community councils and that the potential costs to counties subject to the community council law could be oppressive to smaller counties.
The County argues that all of the reasons articulated by the State why island geography is relevant to the purpose of the act also apply to all island communities of Western Washington. It points out that there are seven other counties on the west coast of Washington which contain populated islands and which also have county populations exceeding 30,000 residents. The County argues that the exclusion of the island communities in seven other counties does not bear a rational relationship to the purpose of the community council act. We agree. When considering the purpose of the statute, to provide an island community with a method to give direct input on the planning and zoning of their community to the county legislative authority and to serve as a forum for the discussion of local issues, we cannot conclude that the exclusion of all other island communities is rational. We disagree with the State's contention that the act is rational because the Legislature may have concluded that only larger island communities need to be allowed to have input to their county governments. The act itself belies this intent. The act provides that a community need include only 1,000 residents or, when the community is an entire island, 300 people. RCW 36.105.030. The act plainly was not intended to create community councils only on islands with large populations. Additionally, the rationale proposed for the requirement that a county have a population exceeding 30,000 people is so that the county government can bear the costs of supporting community councils. It is, therefore, the population of the entire county which is relevant to that purpose, rather than only the population of an island or a proposed community. Furthermore, the County points out that there is no rational reason for larger *384 islands which are part of mainland counties to be excluded from the ambit of the act.
The State relies on County of Cameron v. Wilson, 160 Tex. 25, 326 S.W.2d 162 (1959), in which the Supreme Court of Texas considered a statute authorizing counties bordering on the Gulf of Mexico which have islands suitable for park purposes to finance improvements to Gulf island parks by means of revenue bonds. In a split opinion, the Supreme Court of Texas held that the act did not violate the prohibition on special legislation and that there was a rational basis for the classification since the legislation was for the common good of all citizens of Texas. While supportive of the proposition that island geography may be a permissible classification, with which we agree, that case does not support the State's argument that the application of a statute to only a single island community is necessarily allowed under the prohibition for special legislation. In County of Cameron, the court was looking at a statute which applied to all island counties bordering on the Gulf of Mexico, which included islands suitable for parks. The purpose was related to the class to which the statute applied.
The State also relies on Pacific Am. Fisheries v. Whatcom County, 69 Wash. 291, 124 P. 905 (1912), which held that a statute which extended the boundaries of cities located on bays, lakes, sounds, rivers or navigable waters to the middle of the waterway was not unconstitutional as violative of the special legislation clauses. We do not find that case supportive of the State's position. In that case, the Court concluded that the statute was not special legislation because it applied to all cities so located and was not a special or private law which applied to a particular municipality.

CONCLUSION
Because the County's burden to demonstrate unconstitutionality is high, the question whether the community council act is special legislation is a close question. However, we find ourselves unable to articulate any rational basis why other populated island communities are excluded from the scope of the community council act. The purpose sought to be achieved by the statute is as applicable to island communities which belong to mainland counties as it is to island communities which belong to counties comprised entirely of islands. See City of Seattle, 103 Wash.2d at 674-75, 694 P.2d 641.
We therefore affirm the superior court's decision and conclude that the community council act is special legislation which violates the state constitution.
DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER and TALMADGE, JJ., concur.
SANDERS, Justice, concurring by separate opinion.
Although the majority reaches the right result, it does so in spite of the erroneous, yet oft-repeated, claim that "a statute is presumed to be constitutional and the burden is on the party challenging the statute to prove its unconstitutionality beyond a reasonable doubt." Majority at 380.
I posit it is high-time, if not past time, to challenge this bald assertion for exactly what it is: A statement of ideological preference which favors the legislative branch at the expense of the executive, the judicial, and, most importantly, the individual citizen.
Read the constitution, and read it once again, I find no textual support for the proposition that a usurping legislature may impose an unconstitutional, yet "doubtful," legislative act beyond the remedy of judicial review.
James Madison envisioned a vigorous and independent judiciary which would stand by the citizen's constitutional rightsespecially when under legislative assault:
[I]ndependent tribunals of justice will consider themselves ... the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive....
Creating the Bill of Rights: The Documentary Record from the First Federal Congress 83-84 (Helen E. Veit et al. eds., Johns Hopkins Univ. Press 1991) (quoting 1 Annals of Cong. 439 (Joseph Gales ed., 1789)). Alexander *385 Hamilton, writing Federalist No. 78, dismissed the reasoning of today's majority:
No legislative act therefore contrary to the constitution can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representative of the people are superior to the people themselves; that men acting by virtue of powers may do not only what their powers do not authorise, but what they forbid.
If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution.... It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, ... to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is in fact, and must be, regarded by the judges as a fundamental law. It therefore belongs to them to ascertain its meaning as well as the meaning of any particular act proceeding from the legislative body.... [I]n other words, the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.
Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statute, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.
The Federalist No. 78 (Alexander Hamilton) (May 28, 1788), reprinted in The Federalist Papers by Alexander Hamilton, James Madison and John Jay 395-96 (Garry Wills ed., 1982) (emphasis added).
Much to the same effect was Chief Justice John Marshall's eloquent opinion in Marbury v. Madison, 5 U.S. 137, 176, 1 Cranch 137, 2 L.Ed. 60 (1803):
The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? ... It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or that the legislature may alter the constitution by an ordinary act.
Between these alternatives, there is no middle ground. The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.
....
[A]n act of the legislature, repugnant to the constitution, is void....
The judicial presumption that a legislative act is constitutional unless proved otherwise beyond a reasonable doubt, I submit, cannot be reconciled with the aforementioned pronouncements of Madison, Hamilton, and Marshall. Moreover, the majority's claim that deference to the Legislature is due because "[w]e assume the Legislature considered the constitutionality of its enactments" (Majority at 380) is simply a reformulation of precisely the same argument rejected by our founding fathers two centuries ago.
While the majority may justly claim "the Legislature speaks for the people" (Majority at 380) (emphasis added), it is the constitution, and only the constitution, through which the people speak for themselves. Their voice is fundamental, and it is only by their consent that we are governed.[1]
*386 By necessity any form of deference to the legislative branch, however slight, is a corresponding burden to the citizen who relies upon an independent and impartial judiciary to vindicate and protect his legal rights. Is not the judge who defers to the Legislature at the expense of the citizen-litigant also at odds with the mandate of the Code of Judicial Conduct which requires not only "impartiality," but even the appearance of such? Compare CJC 2(A) ("Judges should respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."). But under the rule posited by the majority, the citizen who seeks to, and by necessity must, rely upon an independent and impartial judiciary to preserve his constitutional rights from legislative deprivation will be reduced to second-class citizenshipsecond, that is, to the public servant who does now, in the words of Hamilton, "rise above his master...."

Factual Presumptions Are Not Legal Answers
Beyond being contrary to our constitutional scheme and corrosive to the function of judicial review, the doctrine as stated by the majority cannot bear the weight of its own logic as factual presumptions do not, and cannot, provide legal answers.
Presumptions find their use when factual questions are in dispute. Black's Law Dictionary 1185 (6th ed.1990) (Definition of presumption is "[a]n inference in favor of a particular fact."). As one commentator has thoughtfully observed:
A presumption, in precise and ordinary usage, is a legislative or court made rule, or statute, that is concerned with matters of evidencematters of fact, not of law. Presumptions are meant to solve problems of missing evidence, such as the presumption of death after a seven year absence; to shift the burden to the party most likely to be in possession of relevant evidence (such as the presumption contained in the doctrine of res ipsa loquitur); or to effect substantive policy by favoring one outcome despite available evidence (for example, a conclusive presumption that a husband is the father of any child conceived during the marriage). Other, looser uses of presumptions serve policy ends by encouraging conditions necessary for an impartial decisionfor example, the presumption of innocence accorded to the criminally accused. All these examples address matters capable of proof or disproof, by evidence.
Jennifer Friesen, State Courts as Sources of Constitutional Law: How to Become Independently Wealthy, 72 Notre Dame L.Rev. 1065, 1091 (1997).[2]
Thus, it is the disputed factual questions, never the legal ones, which may be addressed by resorting to presumptions. Factual presumptions arise from simple necessity. We presume death has occurred when a subject is missing for seven or more years because the only other way to establish death would be to scour the earth for the body. We resort to this factual presumption in reliance upon human experience which indicates when one fact is proved, the fact presumed is likely to follow.
In stark contrast, legal questions are not ordinarily presumptive candidates because the law is at hand. Thus, all courts determine legal issues de novo. In re Electric Lightwave, Inc., 123 Wash.2d 530, 536, 869 P.2d 1045 (1994) ("This court examines issues of law de novo.").
*387 Legal questions concerning the scope of constitutional powers are no less legal questions. See Friesen, supra, at 1091 ("Presumptions cannot decide matters of law, ... [A] true presumption of constitutionality is logically impossible...."); Robert Satter & Shelley Geballe, Litigation Under the Connecticut ConstitutionDeveloping a Sound Jurisprudence, 15 Conn. L.Rev. 57, 70 (1982) ("The standard also is unsuitable because in constitutional cases the issue is one of law, not of fact."). Justice Linde, writing for the majority of our sister court in Oregon, overtly recognized same, noting the "presumption of constitutionality" is a "misleading usage, since presumptions properly refer to the factual predicates (which may include the presumption that the legislature meant to enact a valid law) but not to the legal conclusions at issue." Brown v. Multnomah County Dist. Court, 280 Or. 95, 570 P.2d 52, 56 n. 6 (1977).
I do not believe the presumption of constitutionality of a legislative act unless proved otherwise beyond a reasonable doubt can be applied as a practical matter unless the responsibility of judicial review were completely forsaken. Quite literally the maxim would require a court to sustain the constitutionality of any legislative act where there is any "doubt" as to its constitutionality. It would seem any good faith argument posited by a litigant would at least raise a "doubt" for which a reason exists although that doubt might not ultimately prove persuasive.[3]

Benefit of Doubt
Is not the talisman of an active judicial mind the faculty to test every thesis by raising doubts the less than agile mind would never consider? Enumeration and consideration of such doubts proves the validity of that result which ultimately overcomes them. Would our National Constitution been born had it been tested "beyond a reasonable doubt"? Indeed Delegates to the constitutional convention were counseled by the sage mind of Benjamin Franklin to put aside their well-founded doubts and take their quill pen in hand:
On the whole, Sir, I cannot help express the wish, that every member of the Convention who many still have objections to it, would with me on this occasion doubt a little of his own infallibility, and, to make manifest our unanimity, put his name to this Instrument.[[4]]
(First emphasis added.) And no one less than Oliver Wendell Holmes cautioned, "To have doubted one's own first principles is the mark of a civilized man."[5]
While the majority would profess to immunize constitutionally doubtful legislation from judicial remedy, it is painfully apparent that the reciprocal approach (legislative restraint from enacting legislation which is constitutionally doubtful in the first instance) is the majority's illusion. Still smarting from this judicial rebuke, we draw our example from President Franklin D. Roosevelt who pressed his legislative program to Congress, concerns of its unconstitutionality notwithstanding, when he wrote the Chairman of the Ways and Means Committee in support of passage of the Bituminous Coal Conservation Act of 1935: "I hope your committee will not permit doubts as to constitutionality, however reasonable, to block the suggested legislation."[6]
If it is not the grave and ultimate responsibility of the judiciary to honor its oath to uphold the constitution, then upon whose shoulders will the mantle rest? Is not this exactly that specter of lengthening shadows and changing air about which Justice Douglas warned:

*388 As nightfall does not come all at once, neither does oppression. In both instances, there is a twilight when everything remains seemingly unchanged. And it is in such twilight which we all must be most aware of change in the airhowever slightlest we become unwitting victims of the darkness.[[7]]

Oppression by Presumption
Presumptions clearly favor the party on whose side the presumption lies. See David M. Burke, The "Presumption of Constitutionality" Doctrine and the Rehnquist Court: A Lethal Combination for Individual Liberty, 18 Harv. J.L. & Pub. Pol'y 73, at 90 (1994) ("the `presumption of constitutionality' doctrine imposes such a tremendous burden on an individual challenging an exercise of power by Congress that its construction of its powers is, if not `conclusive,' at least so nearly the case that the disparity between theory and reality is, for purposes of analytical review, essentially irrelevant."). The end result is simply to place the Legislature above the Constitution on at least those occasions where the presumption is marginally determinative.[8] Logically the Legislature is thus permitted to impose an unconstitutional act absent judicial relief under the presumption, which it could not do absent the presumption. Such also holds true even where the challenger is another branch of government such as the executiveor the judiciaryitself. For example, if the Governor asserts the Legislature has acted unconstitutionally in violation of the separation of powers, this court will, under the majority's "presumption," begin its deliberations by presuming the Legislature acted constitutionally until the Governor proves the contrary "beyond a reasonable doubt."
As Justice Utter astutely noted after years on the bench, the presumption of constitutionality "seriously hampers the courts' accomplishment of what article 1, section 1 of the Washington Declaration defines as the fundamental purpose of our state's constitution and government: to protect and maintain individual rights." Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. Puget Sound L.Rev. 491, 507 (1984).

Undermining Separation of Powers
The purpose of our constitutional system is the preservation of individual rights.[9] But "there is no liberty, if the judiciary power be not separated from the legislative and executive." Baron De Montesquieu, The Spirit of the Laws 152 (Thomas Nugent transl., Hafner Press 1949). Separation of powers[10] was intended to balance governmental power against governmental power to prevent the abuse of that power held in any one set of hands.[11] Checks and balances were intended to keep it that way.[12]
*389 Baron De Montesquieu, often credited as the philosophical father or at least prime articulator of the separation of powers doctrine, found political liberty only in those societies where there is no abuse of power and the countervailing force of other power the only realistic curb to that abuse:
But constant experience shows us that every man invested with power is apt to abuse it, and to carry his authority as far as it will go. Is it not strange, though true, to say that virtue itself has need of limits?
To prevent this abuse, it is necessary from the very nature of things that power should be a check to power. A government may be so constituted, as no man shall be compelled to do things to which the law does not oblige him, nor forced to abstain from things which the law permits.
....
The political liberty of the subject is a tranquillity of mind arising from the opinion each person has of his safety. In order to have this liberty, it is requisite the government be so constituted as one man need not be afraid of another.
When the legislative and executive powers are united in the same person, or in the same body of magistrates, there can be no liberty....
Again, there is no liberty, if the judiciary power be not separated from the legislative and executive.... Were it joined to the executive power, the judge might behave with violence and oppression.
Baron De Montesquieu, supra, at 150-52. However today's majority, which regales itself in legislative deference, thereby surrenders at least a portion of that righteous power necessary to check that power exercised by the Legislature. Such capitulation in the face of unconstitutional legislative usurpation is no virtue. It eliminates the most important constitutional check upon legislative abuse. It is license for the strong to vanquish the weak.
Such surrender, often euphemistically denominated "restraint," is sometimes falsely glorified as an aspect of the judiciary's role as a co-equal branch of government; however, in matters of constitutional law, the judiciary is not co-equal, but supreme. Justice Theodore L. Stiles, elected to the Washington State Supreme Court in the same election which popularly ratified the state constitution, made this very point:
The courts are, and in the nature of things, must be the appellate body, and their power of review extends over the entire domain of public and private right. Once it is conceded, as it now is universally, that a statute may be declared void as unconstitutional, there is no denying the proposition of judicial supremacy. Whenever the legislature enacts a law it thereby assumes and asserts that it is constitutional; and whenever the court declares the contrary, the judgment of the court prevails, and there is no power except that of the people in constitutional convention that can reverse it.
Why hesitate then on account of a theoretical equality which does not exist? A little courage exerted a good many years ago, and a little less fear of consequences, would have saved us from the drifting which has carried us so far from the ideal of our forefathers.
Justice T.L. Stiles, "Legislative Encroachments Upon Private Right," reprinted in C.S. Reinhart, History of the Supreme Court of the Territory and State of Washington 47 (Private printing, n.d.). Amen. I have no doubt if the majority rediscovered and then shared the convictions of the founders it would soon find the courage to effect a restoration of those fundamental principles for which our forgotten patriots successfully contended.
The Framers of both the Federal and Washington Constitutions understood that of all the branches the legislative was the most likely to accumulate excessive power.[13] Accordingly, *390 the constitution set additional, and express, limitations upon the Legislature, most notably in the Bill and Declaration of Rights, however also in other sections including the one at issue in this very case. Const. art. II, § 28 ("The legislature is prohibited from enacting any private or special laws in the following cases....").
In the words of Chief Justice John Marshall:
The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written....
....
It is, emphatically, the province and duty of the judicial department, to say what the law is.
Marbury v. Madison, 5 U.S. 137, 176, 1 Cranch 137, 2 L.Ed. 60 (1803).

Conclusion
Nor is it clear how far the majority's presumption would reach. Is it to be applied in all cases, even those where the Legislature is challenged by the Governor?[14] Will it be allowed to subdue our liberties when the legislative acts at odds with an express clause of the Bill of Rights?[15] Does the majority propose this court surrender its responsibility to guard the constitutional flame by smothering it under this mindless cloak of sophistry?
Due respect for our constitutional system requires the court to review, de novo, every challenge to a governmental act where the challenge is that the government has transcended the constitutional boundaries of its authority.[16] Any other standard places the servant above the master and denies the weak their judicial champion.[17] This presumption *391 of legislative constitutionality cannot stand.

Reply to Justice Talmadge
My colleague's "special concurrence" (Sp. conc.) adds heat where light is needed. He favors judicial deference to unconstitutional statutes, yet concedes the beyond-a-reasonable-doubt standard cannot possibly be an evidentiary test. He opines, "Either a statute is constitutional or it is not" (Sp. conc. at 393) but denies the beyond-a-reasonable-doubt maxim the force of its language. For, quite literally, the maxim requires us to hold either a statute is proved unconstitutional beyond a reasonable doubt, or we must uphold it, which literally requires us to opine: Either a statute is proved unconstitutional beyond a reasonable doubt, or we will hold it is constitutional even if it really isn't.
Reminding us he has "served in the Legislature for 16 years" (Sp. conc. at 394), Justice Talmadge applies that experience by debating a colleague rather than the issue at hand and then, as the ultimate fallback for a failed argument, implies the presumption is not a problem, as it has not "affected the outcome of a court's decision on the constitutionality of a state statute." (Sp. conc. at 393). However the former is irrelevant, whereas the latter causes one to question the very existence of a judge-invented rule of constitutional construction thus shorn of all practical effect.
As to what the constitution requires of the legislative authority in this particular context, the answer is provided by the majority. Other statutes and other constitutional provisions are not at issue. Each such legal question must be determined de novo by the court, as with any legal question, without partiality to either of the contending partieseven if one be the government itself. That, it appears, is where my colleague and I part company. See Sp. conc. at 394.[18]
Although comment on how the constitution might apply to other questions which are not before us today would not only be irrelevant but irresponsible, my views on such particular matters are set forth at some length in other opinions over my signature, rather than my colleague's. For example when a majority of this court in an opinion authored by Justice Talmadge declared the initiative which imposed term limits on the legislative branch unconstitutional, I noted in dissent that if doubt were sufficient to save such legislation from constitutional attack, there was more than enough doubt to save that measure. Gerberding v. Munro, 134 Wash.2d 188, 214 n. 6, 949 P.2d 1366 (1998) (Sanders, J., dissenting). There my dissent clearly rested on the constitutional text, not a denunciation of "the majority opinion for ignoring votes of the people" (Sp. conc. at 393 n. 4), although, it be true, the majority in Gerberding hardly deferred to the people. The concurrence (Talmadge, J.) also contains a gratuitous reference to Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), a case which I have never cited in any opinion and which was overruled a half century ago. See, e.g., Day-Brite Lighting Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469 (1952). How this advances the argument escapes me.
And then, of course, is the polemic about "judicial activism." Sp. conc. at 393. Apparently it is my colleague's view that when he opts to set aside an enactment of the Legislature or an initiative passed by the people upon the claim that it is inconsistent with the constitutional mandate he acts with the restraint due a matter of the "gravest concern." Sp. conc. at 394.
However, when one of his colleagues reaches a similar result in another matter contrary to that writer's preference, we witness an unpardonable "act of activism." I venture such rhetoric is better left in the *392 halls of the Legislature from whence my colleague claims his expertise rather than the pages of these reports. For it is my preference that these pages be reserved for discussion of legal issues, not the contest of offensive personality.
TALMADGE, Justice, special concurrence separately.
I write separately to address the concurrence's startling and unprecedented argument for judicial supremacy.[1] Justice Sanders initially points out the beyond-a-reasonable-doubt standard of review for constitutional questions cannot possibly be an evidentiary test, a proposition with which I agree. But the analysis the concurrence presents is so outside the mainstream of Washington's constitutional jurisprudence I challenge the concurrence's lack of regard for the principle of separation of powers and for the proper role of the judiciary in our constitutional system.
Justice Sanders takes exception to the use of a presumption of constitutionality beyond a reasonable doubt when the court considers a statute's constitutionality. He points out Justice Utter asserted the standard "undercut[s] the fundamental rights of Washington citizens, and should therefore be discarded." Justice Robert F. Utter, Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights, 7 U. PUGET SOUND L. REV. 491, 508 (1984).[2] Justice Utter did not give us any concrete examples of how the standard had undercut fundamental rights, so we cannot test his assertion.
Nevertheless, the standard has been around a long time. We first used it as early as 1921. Parrott & Co. v. Benson, 114 Wash. 117, 122, 194 P. 986 (1921). The most recent example of its use, other than by the majority in the present case, is Gerberding v. Munro, 134 Wash.2d 188, 196, 949 P.2d 1366 (1998). The standard is by no means an aberration of Washington law; at least 21 other states employ the same language, some in cases dating well back into the 19th Century. See, e.g., Leavenworth County Comm'rs v. Miller, 7 Kan. 479, 509 (1871). I have not pursued the standard to its root source, but perhaps the expression of Chief Justice Marshall in Fletcher v. Peck, 6 Cranch 87, 10 U.S. 87, 128, 3 L.Ed. 162 (1810), is as close as we can get:
The question whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the constitution and the law should be such that the judge *393 feels a clear and strong conviction of their incompatibility with each other.
It should go without saying that when we consider a constitutional question, we decide the question as a matter of law, not of fact. In the constitutional context, therefore, the beyond-a-reasonable-doubt standard is obviously not an evidentiary standard; nor was it intended to be. It is simply a hortatory expression, a guide for our consideration, a reminder that the Legislaturenot the Courtis the body the people of our state have chosen to make their laws. "The legislature represents this sovereignty of the people, except as limited by the constitution." State v. Clark, 30 Wash. 439, 443, 71 P. 20 (1902). Indeed, the Washington constitutional framers entrusted the legislative power, the power to make laws, to both the Legislature and the people. WASH. CONST. art. II, § 1.
In practice, constitutional questions are decided as yes or no propositions. I have not heard a judge say, and I have not read a case that says, "I believe this statute is clearly and convincingly unconstitutional, but I am not persuaded it is unconstitutional beyond a reasonable doubt." Evidentiary standards of proof are inapposite in constitutional analysis. Either a statute is constitutional or it is not. The concurrence offers no examples of how the application of presumption might have affected the outcome of a court's decision on the constitutionality of a state statute. The issue for the judicial branch is one of according appropriate deference to the legislative branch, a coordinate constitutional branch of government, even when it may not agree with a particular law.[3]
Pursuant to his concurrence, Justice Sanders is now plainly unwilling to accord any deference to legislative enactments when he believes constitutional rights are involved.[4] While Justice Sanders correctly notes we are the ultimate guardian of constitutional rights, and we ought not allow an unconstitutional law to stand simply as a matter of comity to a coordinate branch of government, I cannot agree this gives us license to broadly "constitutionalize" issues using our own views from the bench. There is an ever-present temptation for judges to wrap themselves in the cloak of the Constitution to strike down legislation they do not like. For instance, the majority in Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), did not use its belief such laws are not good policy as a reason for striking down the New York labor law that made it a crime to require bakery workers to work more than 60 hours a week. Rather, it said the law violated the due process clause of the Fourteenth Amendment because, "There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation of a baker." Id. at 57, 25 S.Ct. at 543. In his famous dissent, Justice Holmes smoked out the true basis for the majority's position: "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics." Id. at 75, 25 S.Ct. at 546 (Holmes, J., dissenting).
Left unsaid in the concurrence is what standard of review should apply when considering the constitutionality of statutes. Perhaps it is the view articulated in Gerberding, where Justice Sanders said: "Indeed, to be valid, every law must be reasonable in the constitutional sense." Gerberding, 134 Wash.2d at 230, 949 P.2d 1366 (Sanders, J., *394 dissenting) (citing to Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894)). In employing "reasonableness" as the standard of review for the constitutionality of legislation, Justice Sanders sets himself an easy task, for as Benjamin Franklin wrote, "So convenient a thing is to be a reasonable creature, since it enables one to find or make a reason for every thing one has a mind to do."[5]
The concurrence's approach is judicial activism in full flower: "By judicial activism I mean, quite simply and specifically, the practice by judges of disallowing policy choices by other governmental officials or institutions that the Constitution does not clearly prohibit." Lino A. Graglia, It's Not Constitutionalism, It's Judicial Activism, 19 HARV. J.L. PUB. POL. 293, 296 (1996). Unlike the concurrence, I do not believe the judiciary has a charter, in the guise of constitutional interpretation, to substitute itself for the executive and legislative branches of government. We do not have a constitutional mandate to roam across the governmental landscape changing in our discretion decisions by other constitutional branches of government with which we disagree. There is no check, no balance to such unfettered power. The concurrence offers a paean not only to judicial activism, but to judicial supremacy in our government. I do not agree with such a fundamentally flawed notion of judicial power.
Our role is to analyze the Legislature's enactments against the overarching principles of the constitution, and resolve the dispute brought to us, as we did in this case. It decidedly is not our function to express disrespect for coordinate constitutional branches of government by lightly tossing away their decisions with arrogant judicial fiat, as the concurrence would have us do.
I share the view of the overwhelming majority of judges who, for nearly the entire life of our nation, have thought invalidating an act of the Legislature to be a matter of the gravest concern. This concern stems not from what the concurrence would have us believe as simpering subservience to the Legislature, but from recognition that the people of Washington have declared: "The legislative authority of the state of Washington shall be vested in the legislature." WASH CONST. art. II § 1.
Having served in the Legislature for 16 years, I have good reason to know the Legislature will, from time to time, pass laws I personally consider to be unreasonable. But the struggle to prevent and eliminate what one considers to be unreasonable laws must take place only in the Legislature and at the polls, and not in a rabidly activist judiciary, if we are to preserve intact the tripartite form of government we established in Washington in 1889 and continue to cherish.
NOTES
[1] Justice Richard B. Sanders, "Original Consent," Washington State Bar News 41, 43 (Feb. 1998) ("This precedent subverts the constitution, as effectively as any alien force, in the form of rules of construction and presumptions. These essentially say the government is presumed to be right when it is really wrong; that it is strong, when by the constitutional text it is clearly weak; that no person's right has been violated when in truth his right has been taken; that an unconstitutional statute is nevertheless enforced unless proven to be so beyond a reasonable doubt; or that some alleged preposterous fact exists by virtue of legislative declaration or judicial whimsy, when any school child can tell you, `The emperor has no clothes.'").
[2] See also Gerberding v. Munro, 134 Wash.2d 188, 212, 949 P.2d 1366 (1998) (Sanders, J., dissenting) (questioning propriety of beyond a reasonable doubt presumption to the purely legal question of whether initiative is unconstitutional but observing if the standard were actually applied the majority opinion could not withstand the test of doubt).
[3] Compare 11 Washington Pattern Jury Instructions: Criminal 4.01 (2d ed. 1994) ("A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence....").
[4] Benjamin Franklin, speech at Constitutional Convention, Philadelphia, Sept. 17, 1787 in Writings of Benjamin Franklin 9:607-08 (Albert H. Smyth ed., 1906).
[5] Oliver Wendell Holmes, Ideals and Doubts, 10 Ill. L.Rev. 1, 3 (1915).
[6] Letter from Franklin D. Roosevelt to Samuel B. Hill, Chairman of House Ways and Means Committee (July 6, 1935) in Public Papers and Addresses of Franklin D. Roosevelt, 4:297, 298 (Samuel I. Rosenman ed., 1938).
[7] Letter from William O. Douglas to Young Lawyer Section of Wash. State Bar Assoc. (Sept. 10, 1976) in Douglas Letters 162 (Urofsky ed., Alder & Alder, 1987).
[8] See also Robert Satter & Shelley Geballe, Litigation Under the Connecticut ConstitutionDeveloping a Sound Jurisprudence, 15 Conn. L.Rev. 57, 70 (1982) ("Creating more than a presumption of constitutionality for legislative or executive action places the reaches of those branches almost above the constitution and tends to render the constitution itself subsidiary.").
[9] See Const. art. I, § 1 (The constitution and government "are established to protect and maintain individual rights.").
[10] See generally In re Salary of Juvenile Director, 87 Wash.2d 232, 240, 552 P.2d 163 (1976) (Separation of powers is "`the dominant principle of the American political system.'") (quoting Gordon S. Wood, The Creation of the American Republic, 1776-1787, at 449 (1969)).
[11] The Federalist No. 47, at 324 (James Madison) (Jacob E. Cooke ed., 1961) ("The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny.... [T]he preservation of liberty requires, that the three great departments of power should be separate and distinct.").
[12] The Federalist No. 51, at 349 (James Madison) (Jacob E. Cooke ed., 1961) (Under checks and balances "[a]mbition must be made to counteract ambition" and "[T]hose who administer each department [are given] the necessary constitutional means, and personal motives, to resist encroachments of the others.").
[13] As James Madison warned, "`[T]he legislative department is every where extending the sphere of its activity, and drawing all power into its impetuous vortex.'" Plant v. Spendthrift Farm, Inc., 514 U.S. 211, 222, 115 S.Ct. 1447, 1454, 131 L.Ed.2d 328 (1995) (quoting The Federalist No. 48, at 333 (James Madison) (Jacob E. Cooke ed., 1961)). Madison further forewarned, "[I]t is against the enterprising ambition of th[e] [legislative] department, that the people ought to indulge all their jealousy and exhaust all their precautions." The Federalist No. 48, at 334 (James Madison) (Jacob E. Cooke ed., 1961). Washington is no different. See Lebbeus J. Knapp, The Origin of the Constitution of the State of Washington, 4 Wash. Hist. Q. 227 (1913) ("[O]f all oppressive and unjust instruments of government the legislature is the greatest and most irresponsible." Id. at 250. "The extreme fears of convention concerning the usurpation of power by the legislature are shown by the remarks of a member along that line. `If,' said he, `a stranger from a foreign country were to drop into this convention, he would conclude that we were fighting a great enemy and that this enemy is the legislature.'" Id. at 265.).
[14] Even Justice Scalia admits any such presumption would be improper in turf wars between the legislative and executive branches. See Morrison v. Olson, 487 U.S. 654, 704-05, 108 S.Ct. 2597, 2625-27, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting) ("[W]here the issue pertains to separation of powers, and the political branches are (as here) in disagreement, neither can be presumed correct.").
[15] Even courts which apply the presumption use an opposite presumption when the legislation infringes on an explicit constitutional guarantee. See Simon & Schuster, Inc. v. Members of New York Crime Victims Bd., 502 U.S. 105, 115, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."); Ino Ino, Inc. v. City of Bellevue, 132 Wash.2d 103, 114, 937 P.2d 154, 943 P.2d 1358 (1997) ("The State bears the burden of justifying a restriction on speech."), cert. denied, ___ U.S. ___, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998). Does the majority intend to flip this upside-down as well? It may, because the constitutional clause at issue here (Const. art. II, § 28) is directly infringed.
[16] Some have suggested we go further and presume legislative acts limiting individual liberty be presumed unconstitutional. There is much to be said for this approach. See David M. Burke, The "Presumption of Constitutionality" Doctrine and the Rehnquist Court: A Lethal Combination for Individual Liberty, 18 Harv. J.L. & Pub. Pol'y 73, at 159-62 (1994) ("presumption of liberty."); Robert Satter & Shelley Geballe, Litigation Under the Connecticut ConstitutionDeveloping a Sound Jurisprudence, 15 Conn. L.Rev. 57, 72 (1982) ("[W]here express or implicit rights are infringed, a presumption of unconstitutionality should prevail....").
[17] Others agree. See State v. Aver, 109 Wash.2d 303, 317-18, 745 P.2d 479 (1987) (Utter, J., dissenting) ("[T]his court should abandon the use of the phrase `beyond a reasonable doubt' altogether in the context of determining the constitutionality of statutes."). See also Tom Chambers, When Our Forebears Created the Judicial Branch, 51 Wash. St. B. News 17 (1997) ("[W]hen our forebears drafted our constitution, they recognized that the rich, the powerful and the majority would have their way with the legislative branch of government. They further recognized that those same rich, those same powerful and that same majority would also have their way with the executive branch. That structure leaves to a third arm of government the duty to protect the poor, the weak and the powerless. Realizing that the minority must be protected from oppression by the majority, our forebears created the judicial branch.").
[18] The preference for the "institutional argument" that "legislative choices among conflicting values were beyond judicial competence to criticize and hence beyond judicial authority to strike down" has been described by Professor Tribe as a "dubious step." Laurence H. Tribe, American Constitutional Law § 8-7, at 583 (2d ed.1988). "As long as judges do not fully and irrevocably repudiate the mission of occasionally rejecting majoritarian political choices, there is no honest way for them to escape the burdens of substantive judgment in every case." Id. at 585.
[1] The concurrence here asks in grandiloquent fashion: "Does the majority propose this court surrender its responsibility to guard the constitutional flame by smothering it under this mindless cloak of sophistry?" Concurrence at 390.
[2] Actually, Justice Utter employed the beyond-a-reasonable-doubt standard in cases he wrote both before and after his law review article appeared. Compare Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 528, 520 P.2d 162 (1974) ("A statute's alleged unconstitutionality must be proven `beyond all reasonable doubt' before it may be struck down.") with Department of Ecology v. State Finance Comm., 116 Wash.2d 246, 253, 804 P.2d 1241 (1991) ("the statute is presumed to be constitutional, and the challenging party has the burden of establishing beyond a reasonable doubt that the statute is unconstitutional."). In the Aetna case, Justice Utter propounded a judicial philosophy diametrically opposed to what Justice Sanders seems to be arguing for: "[The Court has no] substantive power to review and nullify acts of the legislature apart from passing on their constitutionality, for no such substantive power exists. We are not a super legislature." Aetna, 83 Wash.2d at 527-28, 520 P.2d 162. In a 1979 case, Justice Utter wrote: "The presumption of constitutionality has long been an established legal doctrine.... This legal rule is founded upon the separation of powers principle, and reflects judicial deference for the actions of the legislative branch of government." Yakima County Deputy Sheriff's Ass'n v. Board of Commissioners, 92 Wash.2d 831, 839-40, 601 P.2d 936 (1979) (Utter, C.J., concurring). I am not aware that Justice Utter ever departed from this view.
[3] As a matter of mutual respect, the executive and legislative branches often ask us to act as arbitrator of their conflicts. See, e.g., Washington State Legislature v. Lowry, 131 Wash.2d 309, 931 P.2d 885 (1997). In our system of checks and balances, the other branches understand, and respect, the role of the judiciary in resolving disputes and interpreting the laws and constitutional principles.
[4] Justice Sanders has written opinions arguing for great deference to determinations by the Legislature. See Magula v. Benton Franklin Title Co., Inc., 131 Wash.2d 171, 192, 930 P.2d 307 (1997) (Sanders, J., dissenting). But see Seeley v. State, 132 Wash.2d 776, 817, 940 P.2d 604 (1997) (Sanders, J., dissenting) (State's justifications for the law forbidding marijuana as a palliative to cancer therapy, "sophomoric."). Compare Gerberding v. Munro, 134 Wash.2d 188, 231, 949 P.2d 1366 (1998) (Sanders, J., dissenting) (denouncing the majority opinion for ignoring votes of the people), with State v. Rivers, 129 Wash.2d 697, 735, 921 P.2d 495 (1996) (Sanders, J., dissenting) (three-strikes initiative, which garnered the votes of 76 percent of the electorate, called "severe, harsh, and merciless ... This statute is unconstitutional on its face.").
[5] BENJAMIN FRANKLIN, AUTOBIOGRAPHY, PART I, quoted in EUGENE C. GERHART, QUOTE IT II, A DICTIONARY OF MEMORABLE LEGAL QUOTATIONS 348 (1988).