**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| LAUREN DAVIS, | No. 84157-2-I |
| Respondent, | |
| v. | PUBLISHED OPINION |
| CODY ARLEDGE, | |
| Appellant. | |

BOWMAN, J. — Cody Arledge appeals a domestic violence (DV) protection order (DVPO) protecting his former partner, Lauren Davis, and the requirement to submit to electronic GPS[1] monitoring. Arledge argues that the trial court abused its discretion in issuing the DVPO by relying on protected speech to find that his repeated communications to Davis amounted to stalking under former RCW 9A.46.110 (2013). And he argues that the trial court's order that he submit to electronic GPS monitoring violates article I, section 7 of the Washington Constitution and the Fourth Amendment to the United States Constitution. We affirm.

FACTS

Davis is a member of the Washington State Legislature. Arledge is a lobbyist and owns his own consulting company. Davis and Arledge met through

---

[1] The Global Positioning System.

This opinion bases the citations and pin cites on the Westlaw online version of the cited material.

work in 2018 and began a romantic relationship in 2019. According to a sworn declaration from Davis, she tried ending the relationship in 2020 and 2021, but due to a "pattern of control and manipulation," she "return[ed] to the relationship."

On June 26, 2021, Davis "cut[ ] all personal ties" with Arledge and told him to stop contacting her. She testified that during that conversation at his house, Arledge "used his body to block [her] exit and forcibly prevented [her] from walking out the door." Afterward, Davis "blocked [Arledge] from [her] phone, social media, and e[-]mail."

From June 26 through July 2021, Arledge contacted Davis more than a dozen times. After she left his house on June 26, he sent her a series of e-mails, saying that he "did nothing to betray" or "hurt" her. Receiving no response, Arledge sent Davis a message from a different e-mail address that she had never seen, repeating that he "did not lie, cheat or betray [her] in anyway," and rehashing several disputes in their relationship. Arledge e-mailed Davis again the next morning, telling her, "I wish you would consider my previous e[-]mails." Davis still did not respond, so, Arledge forwarded the detailed June 26 e-mail to her friends.

On July 7, Arledge e-mailed Davis, "I hope you're well. . . . Please let me know if you or your mom need anything." On July 8, Arledge called Davis twice from a blocked phone number and left her voice messages. In the first voice mail, Arledge asks again about Davis' mother. In the second, he asks Davis to contact his coworker for a work matter.

No. 84157-2-I/3

By late July, Arledge's messages became more accusatory and threatening. He also started insisting that he was the one who ended the relationship. On July 27, Arledge e-mailed Davis, expressing frustration at her for not contacting him and blaming her for "inflicting this deep pain on [him]." On July 29, Arledge left Davis another voice mail, saying that " 'it's unfortunate that you have blown up our personal relationship over something that absolutely didn't happen and that there was no deceiving or mistrust involved.' " Arledge threatened that he would "stop lying for [Davis]" and told her that he considered " 'meeting with [the Washington] House [of Representatives] counsel." He believed that " 'because I stopped our romantic relationship,' " Davis was withholding information and excluding his firm from " 'conversations and meetings that [his firm] should be involved in.' " Again, Davis did not respond to Arledge.

On July 30, Davis confided to a mutual friend that Arledge continued to contact her. The friend spoke to Arledge, who agreed to stop. But then on November 1, Arledge e-mailed Davis at her public legislative address, copying a legislative staffer and blind copying a legislative ethics attorney. He accused Davis of retaliating against him professionally after he ended their relationship.

On November 10, 2021, Davis petitioned for a DVPO. She submitted her sworn declaration and attached as exhibits Arledge's e-mails to her, her friends, and her coworkers and transcripts of his voice mails after she told him to stop contacting her. Davis alleged that she feared Arledge because his "stalking

No. 84157-2-I/4

behavior has escalated substantially," and he has "made threats of suicide in the past, has a severe substance use disorder, and has a number of firearms."

Arledge responded to Davis' petition, arguing that his conduct did not amount to DV under former RCW 26.50.010(3) (2019).[2] He also asserted that his November 1, 2021 e-mail was political speech protected by the First Amendment to the United States Constitution. Along with his response, Arledge filed a declaration, denying any DV. He testified that he was the one who ended the relationship with Davis on June 26, 2021, and that she then became confrontational and fled his home. He denied blocking Davis from leaving and said that he continued to contact Davis only to "salvage a working relationship." He also claimed that the first time Davis told him not to contact her was through their mutual friend on July 30. And he maintained that "I have never in my life threatened suicide."

The court scheduled a hearing on Davis' petition in January 2022. Before the hearing, Davis filed a memorandum in support of the DVPO and also asked the court to order Arledge to submit to electronic GPS monitoring. But on the morning of the hearing, Arledge attempted suicide. His ex-wife called 911 after Arledge e-mailed her a suicide note.[3] The transcript of the 911 call states, in relevant part:

> THE DISPATCHER: So he has attempted this in the past?
> MS. ARLEDGE: No. No, he hasn't.

---

[2] The legislature repealed chapter 26.50 RCW in 2021, effective July 1, 2022. LAWS OF 2021, ch. 215, § 170.

[3] Arledge also e-mailed the note to his son and his attorney representing him in the DVPO proceedings.

4

> THE DISPATCHER: Okay. Has he been suicidal in the past though?
>
> MS. ARLEDGE: Not that I know of. No. One of his girlfriends said that — we've been divorced for 17 years. One of his girlfriends used to say she thought he would kill himself, but he was — he's an alcoholic/addict, but he's been in recovery for a long time. And —
>
> THE DISPATCHER: Okay.
>
> MS. ARLEDGE: I think he's — she's caused him so many legal problems lately. He said he just can't take it anymore.

The parties rescheduled the hearing for March 2022. Before the hearing, Arledge filed supplemental briefing, arguing that even if the court imposed a DVPO, it should deny Davis' request to impose electronic GPS monitoring. He argued that the requirement violated article I, section 7 of the Washington Constitution and the Fourth Amendment.

The hearing on Davis' petition came before a pro tem superior court commissioner on March 18, 2022. The commissioner found that as to the "reasonableness" of Davis' fear, "I don't believe that Mr. Arledge intended to create that fear in a form of harassment and stalking." So, the court denied the petition.

Davis moved to revise the commissioner's order. On May 12, 2022, a pro tem superior court judge held a hearing and granted the motion. The court found that "[w]hen a party tells someone don't contact me and they keep contacting, it can be annoying. But when it comes to a continual flow, I can see where it rises to the level of fear." For examples, the court pointed to the e-mail and voice messages Arledge sent Davis on July 27. It determined that while some communications referenced the parties' business relationship, Arledge cannot "discuss personal issues under the aegis of official business." The court also

5

No. 84157-2-I/6

considered Arledge's recent suicide attempt, noting that it is a "very, very volatile act and it would create fear and it would create sadness for anyone associated with this person."

On May 13, 2022, the trial court issued a 5-year DVPO,[4] restraining Arledge from contacting and coming near Davis and from coming within 1,000 feet of her residence and workplace, with exceptions for Arledge's work. And the court ordered that Arledge "submit to electronic monitoring with victim notification using a GPS ankle monitor. Monitoring shall be provided by 2 Watch Monitoring/2WM. Ms. Davis shall be notified if Mr. Arledge comes within 1[,]000 feet of her residence or workplace." The court imposed the GPS monitoring "for 12 months subject to extension if violated."

Arledge appeals.

ANALYSIS

Arledge argues the trial court abused its discretion in issuing the DVPO based on stalking and violated his constitutional rights in ordering electronic GPS monitoring.

DVPO

Arledge argues the superior court "abused its discretion by relying on protected speech and conduct to find the statutory elements of stalking." We disagree.

When reviewing an order on revision, we look to the superior court's decision, not the commissioner's. State v. Ramer, 151 Wn.2d 106, 113, 86 P.3d

---

[4] The DVPO is set to expire March 18, 2027.

6

132 (2004). We review a trial court's decision to grant a DVPO for abuse of discretion. Rodriguez v. Zavala, 188 Wn.2d 586, 590, 398 P.3d 1071 (2017). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or reasons. In re Marriage of Freeman, 169 Wn.2d 664, 671, 239 P.3d 557 (2010). We may affirm the trial court on any basis supported by the record. State v. Bunner, 86 Wn. App. 158, 161, 936 P.2d 419 (1997).

We review the superior court's findings of fact for substantial evidence. In re Marriage of Fahey, 164 Wn. App. 42, 55, 262 P.3d 128 (2011). "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). And we defer to the trial court's determinations on the persuasiveness of the evidence, witness credibility, and conflicting testimony. Snyder v. Haynes, 152 Wn. App. 774, 779, 217 P.3d 787 (2009).

To obtain a DVPO, a petitioner must show by a preponderance of the evidence that DV occurred. See Smith v. Smith, 1 Wn. App. 2d 122, 131-32, 404 P.3d 101 (2017) (DVPO petition is a special proceeding governed by the civil rules); Reese v. Stroh, 128 Wn.2d 300, 312, 907 P.2d 282 (1995) (Johnson, J., concurring) (burden of proof is "a preponderance of the evidence in civil cases"). Former RCW 26.50.010(3) defines "DV" as

> (a) [p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking as defined in [former] RCW 9A.46.110 of one intimate partner by another intimate partner; or (b) physical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, sexual assault, or stalking as defined in

7

No. 84157-2-I/8

[former] RCW 9A.46.110 of one family or household member by another family or household member.

Davis alleged that Arledge's conduct amounted to stalking. A person commits stalking if

(a) [h]e or she intentionally and repeatedly harasses or repeatedly follows another person; and
(b) The person being harassed or followed is placed in fear that the stalker intends to injure the person, another person, or property of the person or of another person. The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and
(c) The stalker either:
(i) Intends to frighten, intimidate, or harass the person; or
(ii) Knows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person.

Former RCW 9A.46.110(1).

Attempts to contact a person after they give actual notice that they do not want the other person to contact them is prima facie evidence that the stalker intends to intimidate or harass the person. Former RCW 9A.46.110(4). " 'Contact' includes, in addition to any other form of contact or communication, the sending of an electronic communication to the person." Id. "Repeatedly" means "on two or more separate occasions." Former RCW 9A.46.110(6)(e).

"Harasses" means "unlawful harassment as defined in [former] RCW 10.14.020 [(2011)]."[5] Former RCW 10.14.020(2) defines "unlawful harassment" as

a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose.

---

[5] The legislature also repealed chapter 10.14 RCW in 2021, effective July 1, 2022. LAWS OF 2021, ch. 215, § 170.

8

> The course of conduct shall be such as would cause a reasonable
> person to suffer substantial emotional distress, and shall actually
> cause substantial emotional distress to the petitioner.

And "course of conduct" means:

> [A] pattern of conduct composed of a series of acts over a period of
> time, however short, evidencing a continuity of purpose. "Course of
> conduct" includes, in addition to any other form of communication,
> contact, or conduct, the sending of an electronic communication,
> but does not include constitutionally protected free speech.
> Constitutionally protected activity is not included within the meaning
> of "course of conduct."

Former RCW 10.14.020(1).

Arledge argues that the trial court relied on constitutionally protected speech to establish a course of conduct. He avers the First Amendment protects his November 1, 2021 e-mail to Davis. But Arledge made several communications sufficient to establish a course of conduct despite the November 1 e-mail. After Davis asked Arledge to stop contacting her, he sent her almost a dozen e-mails. When Davis tried to block his attempts to contact her, Arledge used alternative e-mail accounts and disguised his phone number to thwart her. These communications are prima facie evidence of a course of conduct intended to harass or intimidate Davis. See former RCW 9A.46.110(4). So, we need not reach Arledge's First Amendment claim

Arledge argues that "none of the e[-]mails over the summer of 2021 contained any threats of bodily harm or violence," and that "[g]iven the three-month gap between those communications and the November 1, 2021 e[-]mail," Davis' fear was not reasonable. But a petition for a protection order does not require an allegation of recent DV or a recent violent act. See Spence v.

9

No. 84157-2-I/10

Kaminski, 103 Wn. App. 325, 333-34, 12 P.3d 1030 (2000).  A showing of present fear based on past conduct is enough to support the petition.  See Muma v. Muma, 115 Wn. App. 1, 6-7, 60 P.3d 592 (2002).

And substantial evidence supports the trial court's finding that Davis' fear was reasonable.  Arledge was upset that Davis ended their relationship in June 2021 and used his body to block the doorway in an attempt to forcibly prevent her from leaving his home.  And Davis testified that Arledge had a substance use disorder,[6] recently relapsed, and had access to firearms.  She also alleged in her petition that Arledge "has made threats of suicide in the past."  Indeed, Arledge attempted suicide the morning of the DVPO hearing, and his ex-wife told the 911 operator that he blamed Davis for his "legal problems."  Davis claimed she was afraid because Arledge met "every high-risk marker for intimate partner homicide, including:  suicidality, depression, substance use disorder, access to firearms, coercive control, stalking, and escalating behavior."[7]  The court did not abuse its discretion by granting Davis' request for a DVPO.

---

[6] Arledge's ex-wife also told the 911 operator that he was a recovering "alcoholic/addict."

[7] In their brief, amici curiae King County Bar Association DV LEAD Project, Family Violence Appellate Project, Eastside Legal Assistance Program, Seattle University Family Law Center, Project DVORA | Jewish Family Service of Seattle, Tacoma pro bono Community Lawyers, Clark County Volunteer Lawyers Program, DV LEAP a Project of Network for Victim Recovery of D.C., the DOVE Project, and New Beginnings argue that "[s]talking is an indication of high lethality risk."  They point to WAC 388-60B-0400(8), which "identifies many high-risk factors to be used when evaluating a [DV] perpetrator for treatment."  We note that these factors largely overlap with the "marker[s]" Davis listed to support her request for a DVPO.

10

No. 84157-2-I/11

GPS Monitoring

Arledge argues that "[e]lectronic [GPS] monitoring based on the record below is unconstitutional" under the Washington Constitution, article I, section 7, and the Fourth Amendment. We disagree.

When presented with arguments under both the state and federal constitutions, we start with the state constitution. State v. Hinton, 179 Wn.2d 862, 868, 319 P.3d 9 (2014). Article I, section 7 of the Washington Constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Article I, section 7 is "qualitatively different from the Fourth Amendment and provides greater protections." Hinton, 179 Wn.2d at 868. Whether the facts show a violation of article I, section 7 is a question of law we review de novo. State v. Sum, 199 Wn.2d 627, 637, 511 P.3d 92 (2022).

We analyze an article I, section 7 claim in two parts—" 'private affairs' " and " 'authority of law.' " State v. Reeder, 184 Wn.2d 805, 814, 365 P.3d 1243 (2015)[8] (quoting In re Pers. Restraint of Maxfield, 133 Wn.2d 332, 339, 945 P.2d 196 (1997) (plurality opinion)). "If a private affair is not disturbed, then there is no violation of article I, section 7." Id. But "[i]f a valid privacy interest has been disturbed, then we must determine whether the disturbance was justified by authority of law." Id.

---

[8] Internal quotation marks omitted.

11

No. 84157-2-I/12

1. Private Affairs

"Private affairs" are "those 'interests which citizens of this state have held, and should be entitled to hold, safe from government trespass.' " State v. Jorden, 160 Wn.2d 121, 126, 156 P.3d 893 (2007)[9] (quoting Maxfield, 133 Wn.2d at 339). To determine whether governmental conduct intrudes on a private affair, we look at the " 'nature and extent of the information which may be obtained as a result of the governmental conduct' and the historical treatment of the interest asserted." State v. Muhammad, 194 Wn.2d 577, 586, 451 P.3d 1060 (2019) (quoting State v. Miles, 160 Wn.2d 236, 244, 156 P.3d 864 (2007)).

Several Washington Supreme Court cases guide our analysis as to whether the order here disturbed Arledge's private affairs. In State v. Jackson, 150 Wn.2d 251, 261-62, 76 P.3d 217 (2003), the court found that law enforcement intruded on a person's private affairs by installing a GPS device on the person's vehicle to track their movements. The court reasoned that "the intrusion into private affairs made possible with a GPS device is quite extensive as the information obtained can disclose a great deal about an individual's life." Id. at 262. Such a device provides a detailed record of the places visited by a person, revealing their "preferences, alignments, associations, personal ails and foibles." Id.

Our Supreme Court relied on the same reasoning in Muhammad, 194 Wn.2d at 586-88, holding that law enforcement disturbed a person's private affairs when it contacted a cell-phone service provider to access, or "ping," a

---

[9] Internal quotation marks omitted.

12

person's "cell-site location information" (CSLI). The court reasoned that CSLI reveals "an intensely intimate picture into our personal lives . . . [,] expos[ing] personal details about family, politics, religion, and sexual associations." Id. at 589. And the court noted law enforcement's "one-time" access to the information was not dispositive in determining whether the location data itself is a private affair. Id. at 589-90.

Here, the court ordered Arledge to wear an electronic GPS monitoring device. The device passively tracks Arledge's location but notifies Davis and law enforcement if Arledge violates the DVPO by coming within 1,000 feet of Davis' residence or workplace. Arledge's location, wherever that may be, is a private affair. And like in Muhammad, it does not matter that law enforcement receives that information at only a specific time. We hold that such a device, like the location monitoring tools used in Jackson and Muhammad, disturbs Arledge's private affairs.

2. Authority of Law

"[I]f a privacy interest has been disturbed, the second step in our analysis asks whether authority of law justifies the intrusion." York v. Wahkiakum Sch. Dist. No. 200, 163 Wn.2d 297, 306, 178 P.3d 995 (2008). Arledge argues that "the 'authority of law' required by article I, § 7 is the equivalent of a valid warrant, unless the State shows that the intrusion falls within one of the jealously guarded and carefully drawn exceptions to the warrant requirement." But the " 'authority granted by a valid[ ] (i.e., constitutional) statute' can [also] provide the 'authority of law' needed to support a disturbance of private affairs." State v. Meredith, ___

13

No. 84157-2-I/14

Wn.2d ___, 525 P.3d 584, 593 (2023)[10] (quoting State v. Gunwall, 106 Wn.2d 54, 68, 720 P.2d 808 (1986)).  The proper question is whether the authority granted by statute is constitutional.  Id.

We presume that a statute is constitutional.  Island County v. State, 135 Wn.2d 141, 146, 955 P.2d 377 (1998).  The party challenging a statute carries the burden of proving it is unconstitutional "beyond a reasonable doubt."  Id.  The challenger "must, by argument and research, convince the court that there is no reasonable doubt that the statute violates the constitution."  Id. at 147.  Whether a statute is constitutional is a question of law we review de novo.  Delivery Express, Inc. v. Dep't of Lab. & Indus., 9 Wn. App. 2d 131, 146, 442 P.3d 637 (2019).

Arledge claims that former chapter 26.50 RCW is unconstitutional as applied because it violates his right to procedural due process.[11]  We disagree.

Both the United States and Washington State Constitutions declare that no one may deprive a person of their life, liberty, or property without due process of the law.  U.S. CONST. amends. V, XIV, § 1; WASH. CONST. art. I, § 3.  Procedural due process refers to the procedures that the government must follow before it deprives a person of life, liberty, or property.  Nieshe v. Concrete Sch. Dist., 129 Wn. App. 632, 640, 127 P.3d 713 (2005).  Due process is a flexible concept, calling for such procedural protections that a particular situation demands.  Mathews v. Eldridge, 424 U.S. 319, 334, 96 S. Ct. 893, 47 L. Ed. 2d

---

[10] First alteration in original.

[11] Arledge does not argue that the statute is facially unconstitutional or overbroad.  As a result, we address only his as-applied due process argument.

14

18 (1976); Morrison v. Dep't of Lab. & Indus., 168 Wn. App. 269, 272, 277 P.3d 675 (2012).  State action that results in the deprivation of constitutionally protected interests is not necessarily unconstitutional; it is only the deprivation of such interests without due process of the law that offends the constitution. Zinermon v. Burch, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990).

Former RCW 26.50.060(1)(j) (2020) authorizes the trial court to impose electronic GPS monitoring as part of a DVPO.  Under the statute, "[u]pon notice and after hearing," the court may "[r]equire the respondent to submit to electronic monitoring."  After receiving a DVPO petition, the court must order a hearing within 14 days.  Former RCW 26.50.050 (2008).  "[P]ersonal service [of the DVPO petition] shall be made upon the respondent not less than [5] court days prior to the hearing."  Id.  "DVPO hearings are 'equitable in nature and may be properly determined by a court on documentary evidence alone.' "  Smith, 1 Wn. App. at 132 (quoting Blackmon v. Blackmon, 155 Wn. App. 715, 723, 230 P.3d 233 (2010)).  But the "trial court has the discretion to allow discovery, live testimony, and cross-examination."  Id.[12]

Washington courts have already determined that former chapter 26.50 RCW does not violate procedural due process.  See State v. Karas, 108 Wn. App. 692, 700-01, 32 P.3d 1016 (2001); Gourley v. Gourley, 158 Wn.2d 460, 469-70, 145 P.3d 1185 (2006).  In Karas, the defendant appealed his conviction for violating a DVPO, arguing that former chapter 26.50 RCW violated his procedural due process rights.  108 Wn. App. at 695-96.  In rejecting the

---

[12] Footnotes omitted.

15

defendant's argument, Division Two reasoned that the provisions of the DV statutes satisfy "two fundamental requirements of due process—notice and a meaningful opportunity to be heard by a neutral decision maker." Id. at 699. The court noted that the statutes include a number of procedural safeguards to prevent the erroneous deprivation of the respondent's rights. Id. at 699-700.

Karas also noted that the DV statutes reflect the government's substantial interest in protecting the safety of the petitioner and the public. 108 Wn. App. at 700. The court reasoned that " '[w]hen the purpose of legislation is to promote the health, safety and welfare of the public and bears a reasonable and substantial relationship to that purpose, every presumption must be indulged in favor of constitutionality.' " Id. (quoting State v. Lee, 135 Wn.2d 369, 390, 957 P.2d 741 (1998) (upholding the constitutionality of the stalking statute and holding that it provides sufficient due process to deprive the respondent of their liberty interest in contacting the person protected by a DVPO, 135 Wn.2d at 378, 394)). Division Two held:

> Considering the minor curtailment of [respondent]'s liberty imposed by the protection order and the significant public and governmental interest in reducing the potential for irreparable injury, [former chapter 26.50 RCW]'s provision of notice and a hearing before a neutral magistrate satisfies the inherently flexible demands of procedural due process.

Karas, 108 Wn. App. at 700.

And in Gourley, the trial court granted a DVPO, protecting the respondent's wife and their children after one child accused the respondent of sexual assault. 158 Wn.2d at 464-66. The respondent appealed the DVPO, arguing that the trial court violated his due process rights by refusing to let him

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

cross-examine the accusing child. Id. at 467. Our Supreme Court rejected his argument, reasoning that "nothing in the statutory scheme explicitly requires a trial judge to allow the respondent in a [DVPO] proceeding to cross-examine a minor who has accused him of sexual abuse." Id. at 469-70. And the court found there was ample evidence in the record for the trial court to make its decision without the child's testimony, so, the procedures did not violate respondent's due process rights. Id. at 470.

Arledge acknowledges Karas and Gourley but argues that "Washington courts have not addressed the implications of 24/7[13] electronic monitoring . . . as opposed to the simple affirmative bars against approaching or harassing the victims of [DV]." According to Arledge, when imposing electronic GPS monitoring, procedural due process demands a higher standard of proof. He says the "intrusion represented by 24/7 electronic monitoring, in the absence of clear and convincing proof of likely criminal conduct, contravenes the privacy protections of . . . [a]rticle I, § 7."

The function of a standard of proof is to instruct the fact finder on the degree of confidence our society expects in the correctness of factual conclusions for a particular type of adjudication. In re Welfare of A.W., 182 Wn.2d 689, 702, 344 P.3d 1186 (2015). To determine whether existing procedures are fundamentally fair and comport with procedural due process requirements, we consider (1) the private interest involved, (2) the risk that the

_____

[13] Twenty-four hours a day, seven days a week.

17

No. 84157-2-I/18

current procedures will erroneously deprive a party of that interest, and (3) the governmental interest involved. Mathews, 424 U.S. at 334-35.

The first Mathews factor "requires identification of the nature and weight of the private interest affected by the official action challenged." City of Redmond v. Moore, 151 Wn.2d 664, 670, 91 P.3d 875 (2004). Arledge contends that he "has a constitutionally recognized right to privacy and the right to be free from unreasonable searches and seizures which are completely compromised by the yearlong 24/7 GPS monitoring imposed by the court." Indeed, the due process clause does protect such interests. See Whalen v. Roe, 429 U.S. 589, 598-99, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977) (recognized privacy interests in avoiding disclosure of personal matters and in independence in making certain kinds of important decisions); Grady v. North Carolina, 575 U.S. 306, 309, 135 S. Ct. 1368, 191 L. Ed. 2d 459 (2015) (the State intrudes in a person's reasonable expectations of privacy "when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements"). But that does not end our inquiry. We must also consider the possible length and degree of the intrusion. See Mathews, 424 U.S. at 340-41 (court considered degree of potential deprivation and length of wrongful deprivation in determining whether due process required evidentiary hearing prior to termination of disability benefits).

Here, the court ordered that Arledge must submit to electronic GPS monitoring for one year, subject to extension if Arledge violates the DVPO. The electronic monitoring device passively records his location; it alerts law

18

enforcement and Davis only if Arledge comes within 1,000 feet of her residence or workplace. So, any intrusion into Arledge's privacy is not permanent, and the degree of the intrusion is limited because the device shares Arledge's location only if he violates the court's order.

The second Mathews factor considers "the risk of erroneous deprivation of the interest at stake through the procedures used and the probable value, if any, of additional or substitute safeguards." Moore, 151 Wn.2d at 671. Arledge fails to identify how the current procedures afforded subject him to an unreasonable risk of error. Nor does he analyze how a higher burden of proof would reduce the risk of erroneous deprivation. As noted above, the statutory scheme applying a preponderance of the evidence standard also allows for notice and the opportunity to be heard at a full hearing. The trial court afforded Arledge those procedures. He could have engaged in discovery, requested to cross-examine witnesses, or testified at the hearing, but he chose not to. The superior court ordered electronic monitoring only after it found by a preponderance of the evidence that Arledge committed DV and posed a credible threat to Davis' physical safety. Arledge fails to show how the current standard of proof, together with other procedural safeguards, subjected him to an unreasonable risk of error.

The third Mathews factor considers "the government interest, including the additional burden that added procedural safeguards would entail." Aiken v. Aiken, 187 Wn.2d 491, 501-02, 387 P.3d 680 (2017). In general, "[t]he state may reasonably regulate [the] right [to privacy] to safeguard society or where it otherwise has a compelling interest." State v. Meacham, 93 Wn.2d 735, 738,

19

No. 84157-2-I/20

612 P.2d 795 (1980). Arledge concedes that "the State has a compelling interest in protecting the victims of [DV] and abuse." Indeed, our legislature has determined that DV "is a problem of immense proportions affecting individuals as well as communities. . . . [DV] costs include the loss of lives as well as millions of dollars each year . . . for health care, absence from work, and services to children." LAWS OF 1993, ch. 350, § 1. When balanced against a respondent's due process rights, "[t]he government has an equally compelling interest in protecting children and preventing [DV] or abuse." Aiken, 187 Wn.2d at 502 (citing Gourley, 158 Wn.2d at 468 ("the government has a compelling interest in preventing [DV] or abuse")).

Balancing the Mathews factors, Arledge fails to show how after a full hearing, the procedural safeguards afforded him violate his due process rights. Because he cannot meet his burden to show that former chapter 26.50 RCW is unconstitutional as applied to him, the authority of the law supports the trial court's order that he submit to electronic GPS monitoring.[14]

Attorney Fees

Davis requests an award of attorney fees under former RCW 26.50.060(1)(g) for responding to this appeal. We may award attorney fees where allowed by statute, rule, or contract. Aiken, 187 Wn.2d at 506. And if attorney fees are allowable below, the prevailing party may recover those fees on appeal. Id. (citing RAP 18.1). Under former RCW 26.50.060(1)(g), a court may

---

[14] Because we conclude that the electronic GPS monitoring here is constitutional under article I, section 7, and our state constitution is more protective than the Fourth Amendment, we do not engage in a Fourth Amendment analysis.

20

No. 84157-2-I/21

"[r]equire the respondent to pay the administrative court costs and service fees . . . and to reimburse the petitioner for costs incurred in bringing the action, including reasonable attorneys' fees."  We grant Davis' request subject to compliance with RAP 18.1.

We affirm the DVPO.

_____
Bowman, J

WE CONCUR:

_____            _____
Smith, C.J.                                 Mann, J.

21