IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ALLISON N CROWSTON,

                Appellant,

    v.

RYAN ROBERT CORY,

                Respondent.

No. 86632-0-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — Allison Crowston appeals the trial court's denial of her petition for a domestic violence protection order (DVPO) against Ryan Cory. Crowston argues that (1) the trial court was required to issue a DVPO after finding that Cory committed domestic violence against her pursuant to RCW 7.105.225(1)(a) and (2) the court improperly based its denial on the passage of time between such conduct and the petition contrary to RCW 7.105.225(2)(e).[1] We agree, reverse and remand for further proceedings.

FACTS

On December 15, 2023, Crowston filed a petition for a DVPO to protect herself against Cory. Crowston requested that the court enter an immediate temporary protection order as well as a temporary order requiring Cory to surrender his firearms.

---

[1] A new version of RCW 7.105.225 is set to be effective as of July 1, 2025, but the relevant language of the statute will remain the same.

The court issued a temporary protection order and temporary order to surrender and prohibit weapons the same day.

In her petition, Crowston asserts that Cory engaged in a pattern of domestic violence during their former marriage that ended in 2015 when she left the relationship. In 2022 Crowston learned from Cory's ex-partner that Cory still angrily obsessed over her and had recently moved near her. In 2023 Crowston encountered Cory in West Seattle twice in two weeks as he attempted to talk to her.[2] She explained in her petition that it was based on the history of her abusive relationship with Cory and the information she recently obtained from Cory's ex-partner that caused her to feel unsafe.

Crowston describes numerous acts Cory committed against her throughout 2014 and 2015 during their previous marriage. In one incident, Cory had a panic attack and grabbed her by the wrist, "squeezing it to the point [Crowston] thought it was going to break" and refused to let go. On multiple occasions, Cory spat on her face and legs. During arguments, Cory threw and broke objects, including one incident where he slammed a countertop so hard his wedding ring broke. He frequently yelled at Crowston and/or used verbally abusive language toward her in public or at home. During a drive to Leavenworth, Cory reached from the passenger side and grabbed the steering wheel and pushed the gas pedal down while Crowston was driving.

In February 2014 Cory expressed suicidal ideation after an argument with Crowston. He called the police, stating he was suicidal and Crowston had told him to kill

---

[2] Crowston clarified facts in her petition during her testimony before the commissioner in January 2024. In her petition, she states that Cory followed her when she moved to West Seattle. During her testimony, she clarified that Cory's ex-partner informed her that Cory moved really close to Crowston.

himself. After he returned from the hospital, he shouted at Crowston, "You did this! You did this!"

On the night Crowston left the relationship in 2015, Cory tracked her location through her phone on an iPad, followed her to a friend's house, and then chased her in his vehicle as she was trying to leave and go to another friend's place. While chasing her, Cory sent her "frightening and angry texts." Crowston told Cory she was "afraid of him and that [she] wanted him to stop." Crowston states, "this event precipitated my leaving [Cory] and our home, and I took very little with me, forfeiting my furniture, home, vehicle, and all of our shared assets just so I could get away from him as soon as possible." After this incident, the parties did not have contact for approximately eight years. Crowston states she did her "best to avoid any and all contact with [him]."

After the parties separated, Crowston sought treatment for her physical and mental health. She received treatment for "[gastrointestinal] issues and vomiting brought on by stress from [Cory's] abuse." She also obtained counseling for post-traumatic stress starting in 2016. Crowston continues to see a therapist in part due to her "past trauma due to [Cory's] abuse."

In August 2022 Cory's ex-partner contacted Crowston "totally out of the blue." Cory's ex-partner told Crowston she had felt unsafe in her relationship with Cory and confided that he had continued his abusive behavior. She informed Crowston that Cory continued to talk about Crowston "constantly and obsessively," he blamed Crowston "for everything wrong in his life," and that he had recently moved to West Seattle near where Crowston currently lives.

In November 2023 Crowston saw Cory standing across the street from her while she was running errands. Cory waved at Crowston, who did not respond.[3] Approximately two weeks later, Cory approached Crowston in a local craft store, where he said hello and tried to converse with her. Crowston walked away from Cory as he continued to try to engage with her and left through a back door.

In January 2024 a court commissioner held a hearing on Crowston's DVPO petition. Both parties appeared pro se.

Crowston said after she left the relationship, she had written a 30- to 40-page document describing the abuse. She said, "My main goal was to never have to go to court. I just wanted to be left alone." Crowston testified she believes her petition is necessary "to protect myself doing my everyday life." Regarding her recent encounters with Cory, Crowston testified, "The last time I saw [Cory] when we were still together, he was following me and … chasing me in a vehicle. So … there's no basis for him to approach me, to say hello, to engage with me whatsoever." She conveyed that "[k]nowing that [Cory] has pinpointed me as the target of his aggression and blame makes me feel especially unsafe." Crowston explained that the encounter frightened her given his history of abusive behavior:

> While this may seem like an innocuous act on his part, I have asked and demanded of him multiple times to never approach me or speak to me again. He knows that even his presence causes fear and intimidation to me given his history of violence and threats against my life, and he only ever approaches me when I am alone.

---

[3] In her petition, Crowston stated that Cory "had attempted to speak" to her during their first encounter in West Seattle. During the testimony before the commissioner, she clarified that he waved at her while she was running errands and Cory admitted he had waved at Crowston.

Cory testified that there were a lot of stressful scenarios in his life that he was not then "equipped to handle" at the age of 28. He explained that "[a]ny stress or difficult panic that came out of me that [Crowston] had to witness was a culmination of a few things." Cory said of Crowston, "I understand why she would be maybe afraid or upset."

Cory responded to some of the specific incidents Crowston alleged. As to the drive to Leavenworth, Cory said he "told [Crowston] to drive faster at one point" but that he "struggle[d] to remember" the incident and had "no recollection of [grabbing the steering wheel and pushing on the gas pedal]."

Cory described the incident where he was hospitalized for suicidal ideation as the culmination of an argument between him and Crowston. Cory testified he told Crowston he "would die if [Crowston] left" him and Crowston responded "go for it." Cory stated that he did not call the police for himself, but that he called his mom the next morning and she called the police because "she could hear in [Cory's] voice that [he] was distraught." Cory did not dispute that he verbally blamed Crowston for the incident.

Regarding the night Crowston left the relationship in 2015, Cory stated he tried to find her because he suspected she was having an affair. Cory testified he "had a hunch where she was so I went to where she was sneaking around at …. [and] unfortunately it was right, and she was there." He refuted that he chased her as she left, stating, "I've never chased anybody in a car, but I was parked outside … of the residence and I watched her leave the building and walk away. And that was the last time I ever saw my ex-wife." Cory did not dispute that he tracked Crowston's location.

Cory did not directly address Crowston's allegations and testimony related to Cory's relationship with his ex-partner, Mallorie Nuttall. Nor did he deny that Crowston

had repeatedly told him not to contact her again. But he did state that he "moved back to West Seattle because someone wanted to offer me a job and I did. I have no idea where my ex-wife or her husband live. I hope they're well and happy. I have no interest or desire to see them for any reason." Regarding the parties' encounters in 2023, Cory stated he "just thought I'd be cordial and say hello because I want to move on with life and I want that for them as well."

The commissioner denied Crowston's petition and later denied her motion for reconsideration. Crowston next filed a motion to revise the commissioner's denial order. In her motion for revision, Crowston argued the "commissioner ignored or failed to give weight to incidents which occurred during our marriage (eight years ago), instead focusing on the most recent encounter I had with [Cory] in isolation from that history."

Crowston was represented by counsel at the revision hearing before the superior court. Cory appeared pro se. The superior court denied Crowston's motion. The court found that Cory's actions in 2014 and 2015 constituted domestic violence under RCW

105.010(9),[4] but the court did not find that Cory's actions in 2023 legally constituted

domestic violence.[5] The trial court stated in its oral ruling,

> [I]f we were back in 2015 or 2016 and Ms. Crowston was asking for a domestic violence protection order, I think it would be very appropriate to issue one. The issue now is we're close to a decade later, and the conduct that prompted her to seek a protection order were, one, having Mr. Cory approach Ms. Crowston while she's at … a craft store … at the West Seattle Junction, and greeting her and asking her how she's doing; and then another incident that … apparently involved seeing her on the street and waving at her a week or two prior to then
> ….
> So the real issue before the Court right now is whether… an order should not issue [under RCW 7.105.225] just because a conduct did not occur recently or because of the passage of time since the last incident giving rise to the petition, and I'm just – I'm having trouble with that. ... Because if taken literally, it would create fairly absurd results.
> And the Court's mindful of the fact that these orders have significant consequences beyond simply ordering a respondent to avoid any contact whatsoever with the petitioner. If that were the only effect, then it would be much easier to grant these orders. But there's significant potential effects. It can prevent someone from getting a job, … it can restrict the ability to travel, [and] it can restrict the ability to have access to firearms.

In its written order the court ruled that there was no "factual basis" to support a finding

that a DVPO "is appropriate or is necessary to safeguard [Crowston]." The court

---

[4] Domestic violence is defined as:
(a) Physical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; coercive control; unlawful harassment; or stalking of one intimate partner by another intimate partner; or
(b) Physical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; coercive control; unlawful harassment; or stalking of one family or household member by another family or household member.
RCW 7.105.010(9).
As of July 1, 2025, a new and reorganized version of RCW 7.105.010 is set to go into effect. In the new version of the statute, the definition of domestic violence will be found under RCW 7.105.010(10). However, the language of the definition will remain the same.
[5] The court also found that Cory's conduct in 2023 did not constitute unlawful harassment under RCW 7.105.010(36)(a) or stalking under RCW 7.105.010(34).

additionally found that "[t]here was no evidence that Respondent knows where Petitioner lives or works, and no evidence that he has attempted to locate her or deliberately to initiate contact with her since the parties separated in 2015." The temporary protection order and order requiring Cory's surrender of firearms expired that same day.

Crowston appeals.

DISCUSSION

Crowston argues the trial court was mandated to grant her DVPO petition pursuant to RCW 7.105.225(1)(a) and improperly denied her petition in violation of RCW 7.105.225(2)(e). We agree. Cory did not submit a response brief.

On a motion for revision, we review the superior court's decision because it supersedes the commissioner's decision. Cox v. Fulmer, 31 Wn. App. 2d 485, 489, 555 P.3d 431 (2024). We review a trial court's decision to grant or deny a request for a protection order for an abuse of discretion. Id. (citing Maldonado v. Maldonado, 197 Wn. App. 779, 789, 391 P.3d 546 (2017)). We will not disturb a trial court's exercise of discretion without a clear showing of abuse. Graser v. Olsen, 28 Wn. App. 2d 933, 940, 542 P.3d 1013 (2023). A trial court abuses its discretion where its decision is manifestly unreasonable, based on untenable grounds, or based on an untenable basis. In re Marriage of Chandola, 180 Wn.2d 632, 642, 327 P.3d 644 (2014). A decision based "on an erroneous view of the law" is an abuse of discretion. Cox, 31 Wn. App. 2d at 489 (quoting Gildon v. Simon Prop. Grp., Inc., 158 Wn.2d 483, 494, 145 P.3d 1196 (2006)). A reviewing court will not find an abuse of discretion unless it is convinced that no

reasonable person would take the view adopted by the trial court. Graser, 28 Wn. App. 2d at 940.

The key question in this case is whether the trial court's denial of Crowston's DVPO petition violated statutory mandates. We review questions of statutory interpretation de novo to give effect to the legislature's intentions. Rodriguez v. Zavala, 188 Wn.2d 586, 591, 398 P.3d 1071 (2017). When possible, a reviewing court derives legislative intent solely from the plain language, considering the text of the provision at issue, the context of the statute in which the provision is located, related provisions, and the statutory scheme as a whole. Id. "Plain language that is not ambiguous does not require construction." Id. Thus, where a statute's language is unambiguous based on a plain language reading, a court's inquiry ends. State v. Gray, 174 Wn.2d 920, 927, 280 P.3d 1110 (2012).

Chapter 7.105 governs the issuance of civil protection orders. The legislature recognizes that "[d]omestic violence is a problem of immense proportions." RCW 7.105.900. The legislature's primary purpose in enacting the chapter is to protect victims of domestic violence, stalking, harassment, and other forms of abusive or threatening behavior. Id.

Subsection (1) of RCW 7.105.225 provides that "[t]he court shall issue a protection order if it finds by a preponderance of the evidence that the petitioner has proved the required criteria specified in (a) through (f) of this subsection for obtaining a protection order under this chapter." (Emphasis added.) The required criteria that applies to a DVPO is a finding that "the petitioner has been subjected to domestic violence by the respondent." Id. Subsection (2) provides six grounds upon which a trial

9

court "may not deny or dismiss a petition for a protection order," including that "the conduct at issue did not occur recently or because of the passage of time since the last incident of conduct giving rise to the petition." RCW 7.105.225(2)(e).

Here, upon finding that Cory committed domestic violence against Crowston as part of the alleged conduct underlying her DVPO petition, the plain language of RCW 7.105.225(1)(a) obligated the court to issue a DVPO regardless of when the domestic violence occurred. RCW 7.105.225(2)(e).[6] The trial court instead seemingly denied Crowston's petition based on finding that Cory's most recent conduct in 2023 did not constitute domestic violence. However, it is apparent from the record that Crowston's request for a DVPO was not solely based on Cory's conduct in 2023. Crowston explained how her concern regarding the 2023 conduct stemmed from Cory's conduct during their former marriage and from being told by Cory's ex-partner that he was angrily obsessed with her, resented her, and moved near her. Crowston expressed that despite Cory knowing she never wanted contact with him again and that his very presence causes her fear and intimidation, he attempted to engage with her twice in two weeks. It was this connected chain of events following a pattern of domestic violence that gave rise to Crowston's request for protection.

The trial court suggested that Crowston did not need a DVPO because there was "no evidence that Respondent knows where Petitioner lives or works, and no evidence that he has attempted to locate her or deliberately to initiate contact with her since the parties separated in 2015." However, as cited to by Crowston for persuasive authority, under RCW 7.105.225(1)(a), a petitioner is entitled to a DVPO "upon a finding of

---

[6] The court's finding is unchallenged and thus a verity on appeal. Halvorsen v. Ferguson, 46 Wn. App. 708, 722, 735 P.2d 675 (1986).

domestic violence without additional assessment of risk." Bergman v. Moto, No. 85588-3-I slip op. at 3 (Wash. Ct. App. Jan. 7, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/855883.pdf.[7]

The trial court further suggested in its oral ruling that had Crowston petitioned a DVPO "back in 2015 or 2016," the court would have granted it. This contradicts the language of RCW 7.105.225(2)(e) that bars a trial court from considering the time that has elapsed since the last occurrence of domestic violence underlying a petitioner's DVPO request. A petitioner is not required to allege a "recent [domestic violence] or a recent violent act" to obtain a protection order. Davis v. Arledge, 27 Wn. App. 2d 55, 66, 531 P.3d 792 (2023) (citing Spence v. Kaminski, 103 Wn. App. 325, 333-34, 12 P.3d 1030 (2000)); see RCW 7.105.900(3)(a) ("Washington state studies have found that domestic violence is the most predictive of future violent crime by the perpetrator.").

Our legislature has found that it is in the public interest to improve the lives of individuals being victimized by acts of domestic violence and its dynamics, including implementing measures to prevent future domestic violence from occurring. RCW 7.105.900(3)(a); see also Ann E. Freedman, Fact-Finding in Civil Domestic Violence Cases: Secondary Traumatic Stress and the Need for Compassionate Witnesses, 11 AM. U. J. GENDER SOC. POL'Y & L. 567, 585 (2003) (stating that it is generally accepted that a domestic abuser's behavior will escalate in severity and frequency over time and that victims will often need many attempts over a period of years to put an end to the abuse).

---

[7] While unpublished opinions of this court have no precedential value and are not binding on any court, parties may cite an unpublished opinion filed after March 1, 2013 for its "persuasive value." GR 14.1(a). And we may cite an unpublished opinion for its "reasoned decision." GR 14.1(c).

Relationships marked by domestic violence are diverse and complex, and civil protection orders provide a critical resource in "confronting the dynamics of power and control as well as particular acts of violent abuse." Freedman, supra, at 585; Sarah Martin, Evidence-Based, Constitutionally-Sound Approaches to Reducing Gun Fatalities in Violent Relationships, 6 BELMONT L. REV. 245, 246, 248-50 (2018). It is imperative that a legal system operate from an understanding of the dynamics of domestic violence to be effective in protecting victims from abuse. James Martin Truss, The Subjection of Women … Still: Unfulfilled Promises of Protection for Women Victims of Domestic Violence, 26 ST. MARY'S L.J. 1149, 1155-56 (1995); Laurie S. Kohn, Barriers to Reliable Credibility Assessments: Domestic Violence Victim-Witnesses, 11 AM. U. J. GENDER SOC. POL'Y & L. 733, 740 (2003).

The trial court expressed concerns about the application of RCW 7.105.225(2)(e) rendering potentially absurd results. The issue before us, however, is whether the trial court erred in applying RCW 7.105.225(2)(e) to the instant record. See State v. Monfort, 179 Wn.2d 122, 129, 312 P.3d 637 (2013) (stating that "de novo review is limited to the legal conclusions the trial court drew from its findings of fact") (citing State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)). In such a determination we thus need not entertain hypothetical circumstances outside of the record that could potentially create absurd results under the statute. See also Duke v. Boyd, 133 Wn.2d 80, 87, 942 P.2d 351 (1997) (citation omitted in original) ("Although the court should not construe statutory language so as to result in absurd or strained consequences, neither should the court question the wisdom of a statute even though its results seem unduly harsh.");

State v. Ervin, 169 Wn.2d 815, 824, 239 P.3d 354 (2010) (stating if a result "is conceivable, the result is not absurd").

Here, the trial court found that Cory's actions in 2014 and 2015 legally constituted domestic violence, requiring the court to issue a DVPO. RCW 7.105.225(1)(a). The record establishes that Crowston's current fear is grounded in this pattern of domestic violence and learning that Cory remains obsessed with her and recently moved near where she resides. The record also supports that Cory understood why Crowston would be fearful of him given their past history, and that Crowston made it previously known to Cory that she did want him to contact her. When he first tried to engage with her in 2023 by waving to her, Crowston did not respond. He then again tried to contact her when he saw her shopping two weeks later. In declining Crowston's DVPO based on the passage of time since the underlying domestic violence occurred, the trial court misapplied RCW 7.105.225(2)(e).

We agree with the trial court that protection orders can have significant consequences for respondents. But the legislature has recognized the complexity of domestic violence and expressly rejected requiring petitioners to establish a recent domestic violence act to obtain a protection order. RCW 7.105.900; RCW 7.105.225(2)(e). Importantly, the legislature has granted courts great discretion to tailor restrictions or conditions of protection orders to grant the relief a court deems proper based on a case's particular circumstance. RCW 7.105.310(1).[8] This includes contact and geographic restrictions. See, e.g., RCW 7.105.310(1)(b), (e).

---

[8] A new version of RCW 7.105.310 is set to go into effect as of July 27, 2025, except for section 1, which takes effect March 31, 2026.

In her request for relief, Crowston seems to suggest that because the trial court was required to grant her DVPO petition, the court must also enter an order for Cory to surrender his weapons. During the commissioner hearing, Crowston testified that Cory possessed several unlicensed firearms that he stored unsecured under the bed. She testified that Cory asked her and a friend to hold a firearm to feel "powerful," but conceded that he never threatened her with firearms. Cory testified that he has owned firearms since he was young, he has a firearm safe, and that his firearms are registered. Crowston concedes on appeal that because the trial court denied her DVPO petition on revision, it did not reach the merits of her request for the entry of a weapons surrender order. In fact, even when a court issues a DVPO, that in itself is not dispositive as to whether the court shall order weapons surrendered. RCW 7.105.310(1)(m) provides that in issuing a DVPO a trial court may consider firearm restrictions pursuant to RCW 9.41.800. It is the conditions outlined in RCW 9.41.800 that guide courts as to when they shall order the respondent to surrender weapons.[9]

---

[9] The court shall order the respondent to surrender weapons when the respondent is subject to an order under chapter 7.105 RCW that meets the following conditions:

  (a) [the order was] issued after a hearing of which the party received actual notice, and at which the party had an opportunity to participate, whether the court then issues a full order or reissues a temporary order. If the court enters an agreed order by the parties without a hearing, such an order meets the requirements of this subsection;

  (b) Restrains the party from harassing, stalking, or threatening an intimate partner of the party, the protected person, or child of the intimate partner, party, or protected person, or engaging in other conduct that would place an intimate partner or protected person in reasonable fear of bodily injury to the intimate partner, protected person, or child; and

  (c)(i) Includes a finding that the party represents a credible threat to the physical safety of the intimate partner, protected person, or child; or

  (ii) By its terms, explicitly prohibits the use, attempted use, or threatened use of physical force against the intimate partner, protected person, or child that would reasonably be expected to cause bodily injury.

RCW 9.41.800(2).

At the end of the hearing, despite denying Crowston's petition, the court addressed Cory:

> Mr. Cory, it ought to be incredibly clear to you at this point that Ms. Crowston is afraid of you, rightly or wrongly. …And it doesn't really much matter -- feelings aren't right or wrong, feelings are what they are. But she is afraid of you. She doesn't want to see you. She doesn't want to talk to you. Stay away from her. Now, this is not a court order. You can do what you want. But this denial is without prejudice.
> So if there are more incidents of unwanted contact, she's free to come back to court, and I think that the next time she does, if she does, and I hope it is not necessary, I think a judicial officer is going to look at this a little bit differently. Okay?
> So just leave her alone. If you see her on the street, turn around and go the other way. Again, this is not a court order, but this is the best advice I could possibly give you.

The plain language of RCW 7.105.225(2)(e) does not require Crowston to wait for another domestic violence incident before requesting a court, with the authority of law, to order Cory to not contact her.

We conclude the trial court abused its discretion by denying Crowston's DVPO petition when it found that Cory had perpetrated domestic violence against her. We reverse and remand for the trial court to enter a DVPO pursuant to RCW 7.105.225(1)(a) after a hearing in which it determines what restraints are warranted and whether respondent should be required to surrender weapons under RCW 9.41.800.

_____, J.

WE CONCUR:

_____, ACJ    _____, J.

15